```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| ANTONIA TESCHNER, ) | |
| ) | |
| Claimant, ) | |
| v. ) | HONORABLE JOSEPH E. IRENAS |
| ) | CIVIL ACTION |
| COMMISSIONER OF SOCIAL ) | NO. 04-2884 (JEI) |
| SECURITY, ) | |
| ) | **OPINION** |
| ) | |
| Defendant. ) | |

**Appearances:**
JACOBS SCHWALBE & PETRUZZELLI, P.C.
By: Robert Anthony Petruzzelli, Esq.
Woodcrest Pavilion
Ten Melrose Avenue, Suite 340
Cherry Hill, New Jersey 08003
        Counsel for Claimant

CHRISTOPHER J. CHRISTIE, UNITED STATES ATTORNEY
By: Susan Reiss, Esq.
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
        Counsel for Defendant

**IRENAS**, Senior District Judge:

    Antonia Teschner ("Claimant") brings this action pursuant to

42 U.S.C. § 405(g) for review of the final determination of the

Commissioner of the Social Security ("Commissioner") denying her

application for benefits as the surviving child of a recipient of

disability insurance benefits under the Social Security Act.  For

the following reasons, this Court will reverse the decision of

                               1

the Commissioner and remand the case to the Commissioner for the payment of benefits.

## I.

### A.

Claimant's mother Marian Teresa Teschner ("Teschner") and Jimmy Jirau ("Jirau") lived together in Atlantic City, New Jersey, (RR. 88-92, 217), up until several months before the birth of Claimant on March 19, 1986. (R. 217.) When the relationship ended, Jirau left Atlantic City and moved to Maryland. (*Id*.)

On January 24, 1989, Jirau filed for disability insurance benefits. (R. 56.) On this form, Jirau did not list Claimant under the section reserved for dependents who may be eligible for benefits. (*Id*.) Jirau died on May 6, 1989, in Washington, D.C. (R. 162.) At the time of his death, Jirau was fully insured and eligible to receive disability benefits.

Teschner first filed a claim on Claimant's behalf for surviving child's benefits on the earnings record of Jirau on July 20, 1989 ("the 1989 claim"). (RR. 60-63.) That claim was initially denied by Administrative Law Judge Frank A. Cristaudo in a decision dated June 10, 1993, on the ground that Claimant failed to meet the relationship requirements of the Social Security Act to be entitled to benefits as the child of Jirau.

2

(RR. 128-30.)  The Appeals Council denied Teschner's request for review in a letter dated June 29, 1994. (RR. 142-43.)

Teschner subsequently instituted a paternity action in the Superior Court of New Jersey, Atlantic County, Chancery Division. On February 16, 1999, the Superior Court issued an order proclaiming Jirau to be the father of Claimant ("the New Jersey order").  *Teschner v. Jirau*, No. FD-01-976-99B (N.J. Super. Ch. Div. Feb. 16, 1999).

Teschner filed the instant application for surviving child's benefits on behalf of her daughter on March 15, 1999.[1]  (RR. 151-55.)  A copy of the New Jersey order was submitted with the claim for benefits as a means to supersede administrative res judicata. The claim was initially denied on June 13, 1999.  (RR. 166-68.) Upon reconsideration of the decision, the denial was upheld. (RR. 178-84.)  Claimant then requested a hearing before an ALJ, which was held on December 12, 2002.  (RR. 24-55.)

On April 4, 2003, ALJ Joseph A. Pachowski found that Claimant could not produce evidence required to establish paternity pursuant to 42 U.S.C. § 416(h).  He determined that Claimant failed to present "new and material evidence" showing that Jirau was her father that was not offered in conjunction with the 1989 claim.  (R. 23.)  Pursuant to this determination,

---

[1] Teschner died on June 9, 2001, (R. 194), and her parents, Mariono D. Perri and Helena E. Perri, became Claimant's legal guardians.  (R. 338.)

he ruled that her second claim was barred by the doctrine of res judicata. (*Id*.)  *See* 20 C.F.R. § 404.957(c)(1)(1994).  Despite this conclusion, the ALJ also analyzed the merits of the applications and determined that Claimant was not eligible for surviving child's benefits.

Claimant appealed, and on April 20, 2004, the Appeals Council issued a decision affirming the denial of benefits.  (RR. 9-12.)  The Appeals Council granted review of the case, noting, "while the provisions of res judicata can be a basis to dismiss a request for hearing, it is not proper to issue a denial decision."  (R. 9.)  The Appeals Council then reviewed the case *de novo* and found that, even with additional evidence from genetic testing, Claimant could not satisfactorily prove that Jirau was her father.  (RR. 9-12.)  The Appeals Council opinion became the final decision of the Commissioner.  20 C.F.R. § 404.981 (1980).

Pursuant to 42 U.S.C. § 405(g), Claimant then filed the instant Complaint in the District of New Jersey on June 21, 2004, seeking review of the Commissioner's decision.

**B.**

The administrative record contains documentary and testimonial evidence presented by Claimant in support of her claim that she was entitled to surviving child benefits as the

4

daughter of Jirau.  Evidence from the 1989 claim for surviving child's benefits is also included, as well as records of the Commissioner.

Claimant presented several documents identifying Jirau as her father, including the New Jersey order.  (R. 163.)  She submitted a Certificate of Baptism listing Teschner and Jirau as Claimant's parents.  (R. 107.)  Claimant also presented a NUMIDENT registration record[2] (R. 80), and newspaper birth announcements, all of which list Jirau as Claimant's father. (R. 109.)

Jirau was not listed as Claimant's father on her birth certificate.  (R. 79.)  Additionally, on his application for disability benefits, Jirau denied that he had any children. (R. 58.)  Jirau did not list Claimant as a dependent on his tax returns.  (R. 86.)  Claimant was not named as a beneficiary of Jirau's will or his life insurance policy.  (*Id*.)  There was also some indication in the record that Jirau denied paternity to the Atlantic County welfare department, which was attempting to obtain paternity testing at the time Jirau died.  (RR. 72, 156.)

Teschner's friends and family testified that Jirau was

---

[2]The NUMIDENT is an electronic file of processed Social Security number applications.  The NUMIDENT record is created at the time Social Security numbers are assigned, and includes the assignee's name, date and place of birth, and names of the parents.

5

Claimant's father and that he supported Claimant by sending money to Teschner.  Teschner's sister, Diane Buchman, testified that Jirau acknowledged to her that he was the father of Claimant, and that on the day after Claimant's birth, Jirau telephoned Teschner's mother's house to inquire about Claimant's birth. (RR. 48-51.) Helena Perri, Claimant's maternal grandmother, testified that Jirau and Teschner were living together in Atlantic City before Claimant's birth.  (R. 36.)  She also claimed that Jirau and Teschner both told her that Jirau the father of Claimant.  (R. 37.)  In conjunction with the 1989 claim, both women made statements that were substantially similar to their current testimony, except neither woman had mentioned that Jirau acknowledged paternity.  (RR. 93, 114-15.)

   Claimant testified that her mother told her that Jirau was her father.  (R. 45.)  Claimant also stated that Teschner gave her pictures of Jirau that she kept by her bed.  (*Id*.)  She explained that although she never met her father, she never questioned the fact that Jirau was her father.  (R. 46.)

   Jirau's brother, Manuel Jirau, testified and stated in an affidavit that Jirau acknowledged that he was the father of Claimant shortly before he died.  (RR. 42-43, 118.)  By contrast, in a statement dated March 6, 1991, Manuel Jirau stated only that he believed, to the best of his knowledge, that Jirau was Claimant's father.  (R. 100.)

In February, 2002, Manuel Jirau submitted to a blood test in order to determine the probability that his brother was Claimant's father.  (R. 299.)  The test concluded that there was a 97.62% probability that Jirau was the father of Claimant as compared to an untested, unrelated man.[3]  (*Id.*)  Manuel Jirau claimed that neither he nor his brothers had sexual relations with Teschner.[4]  (R. 40-41.)  Manuel Jirau and Antonio Jirau, also Jirau's brother, submitted affidavits stating that neither of them had sexual relations with Claimant's mother.  (RR. 236, 238.)

Claimant also submitted the affidavit of her mother, dated November 18, 1999, in which Teschner stated that Jirau was Claimant's father and that he contributed to her support.  (R. 64.)  Teschner said that Jirau contributed $100 in cash per week in support from Claimant's birth until Jirau became ill in 1988.  (*Id.*)  After the onset of his illness, she claimed that he contributed $25-50 a week until he died.  (*Id.*)  When Teschner was contacted by the Social Security Administration in conjunction with the 1989 claim, however, she admitted that Jirau denied paternity so he would not have to pay support.  (R. 96.)

---

[3]The Commissioner noted that the DNA test did not eliminate Jirau's brothers as the father of Claimant.

[4]It is unclear exactly how many brothers Jirau had.  The record includes references to Manuel, Alexander, Adolfo Antonio and Angel Jirau.

7

Carolyn Augsberger, a friend of Teschner, also testified at the hearing and stated in an April 17, 2001, certification that Jirau contributed to the support of Claimant. (RR. 32-35, 216.) This statement was purportedly submitted in connection with the New Jersey proceedings, however, it is dated more than two years after the order determining paternity was issued. (R. 216.) In contrast to Claimant's mother's statement, Augsberger states that Jirau was not supporting Claimant at the time he died, as he stopped sending money a year before his death. (*Id.*)

**II.**

42 U.S.C. § 405(g) sets forth the standard of review that this Court utilizes in reviewing a final determination of the Commissioner. Findings of fact by the Commissioner are conclusive if they are supported by "substantial evidence." 42 U.S.C. § 405(g) (2002). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980).

This Court's review is plenary as to the Commissioner's application of the relevant law. *Krysztoforski v. Chater*, 55 F.3d 857, 858 (3d Cir. 1995). Even if the Commissioner's factual

8

findings are supported by substantial evidence, a district court "may review whether the administrative determination was made upon correct legal standards." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983).

It is within this Court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

### III.

### A.

42 U.S.C. § 402(d) provides that a child of a deceased recipient of disability benefits under the Social Security Act is entitled to surviving child's benefits. In order to qualify for child's insurance benefits, the claimant must (1) file an application for benefits, (2) be unmarried, (3) be (i) under the age of 18, or (ii) a full-time elementary or secondary school student under the age of 19, or (iii) under a disability which began before the child turned 22, and (4) be dependent on the deceased recipient at the time of the insured's death.[5]  42 U.S.C. § 402(d)(1)(A) - (C)(2000).

Additionally, the claimant must demonstrate that she is the

---

[5]Natural children are considered to be dependent on their insured parent. 20 C.F.R. § 404.361(a)(1999).

9

child of the deceased recipient. 42 U.S.C. § 416(h) outlines the requirements for establishing a parental relationship. *See also* 20 C.F.R. § 404.355 (1998). Section 416(h)(2)(A) provides that a claimant who is deemed to be the child of the deceased recipient under the intestacy laws of the state where the deceased was domiciled at the time of his death is considered to be the child for the purposes of the Social Security Act. *See also* 20 C.F.R. § 404.355(a)(1).

If the claimant is unable to meet the requirements of the state's intestacy laws, the claimant may still establish that she is the child of the deceased recipient by satisfying the requirements of Sections 416(h)(2)(B) or (3)(C). Section 416(h)(2)(B) provides that a claimant may establish that she is the child of the deceased by showing that the deceased recipient and the claimant's other parent went through a marriage ceremony, which but for a legal impediment would have created a valid marriage.[6] *See also* 20 C.F.R. § 404.355(a)(2).

Under Section 416(h)(3)(C)(i) a claimant may establish a parental relationship by demonstrating that, while alive, the deceased recipient (1) acknowledged in writing that the claimant was his or her child, (2) was decreed by a court to be the parent of the claimant, or (3) was ordered by a court to pay child

---

[6]Claimant has never asserted that her mother and Jirau participated in a marriage ceremony.

10

support because the claimant was his or her child.  *See also* 20 C.F.R. § 404.355(a)(3).  Alternatively, Section 416(h)(3)(C)(ii) states that a claimant may also prove parentage by providing evidence satisfactory to the Commissioner of Social Security that the deceased recipient was her father, and that he was either living with or contributing to the support of the claimant at the time of his death.  *See also* 20 C.F.R. § 404.355(a)(4).

**B.**

In an Appeals Council opinion issued April 20, 2004, the Commissioner determined that, on the evidence presented, Claimant was not entitled to surviving child benefits on the earnings record of Jirau.  The Commissioner concluded that Claimant was not the child of Jirau under any provision of the Maryland intestacy statute as required by Section 416(h)(2)(A).  Next, the Commissioner held that Claimant was not the child of Jirau pursuant to Section 416(h)(2)(B) because Teschner and Jirau never went through a marriage ceremony.  Third, the ALJ found that Claimant was not the child of Jirau pursuant to Section 416(h)(3)(C) because (i) Jirau did not acknowledge in writing that Claimant was his child, nor was he decreed to be her father by a court prior to his death or ordered by a court to contribute to her support, and (ii) the record did not establish that Jirau was her natural father or that he was living with or supporting

11

Claimant at the time of his death.

**IV.**

Claimant argues that the Commissioner's determinations that (1) she was not a child of Jirau for the purposes of Maryland's intestacy law, and (2) she was not Jirau's natural child and Jirau had not contributed to her support before his death, are not supported by sufficient evidence. The Court finds that the Commissioner's factual findings are supported by substantial evidence, but that the Commissioner made significant errors of law in improperly rejecting the New Jersey order.

Jirau was domiciled in Maryland at the time of his death, although he died in Washington, D.C. (R. 162.) The Commissioner correctly looked to Maryland law to determine whether Claimant is entitled to inherit from Jirau, and thus satisfy the requirements of Section 416(h)(2)(A).

Section 1-208 of the Maryland Code, Trusts and Estates, provides the criteria for determining whether a non-marital child is entitled to inherit from a putative father. *See Massey v. Weinberger*, 397 F. Supp. 817 (D. Md. 1975). Section 1-208 provides, in relevant part:

> (b) A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father:
>
> > (1) Has been judicially determined to be

        the father in an action brought under
the statutes relating to paternity
proceedings, or

        (2) Has acknowledged himself, in
writing, to be the father;[7] or

        (3) Has openly and notoriously
recognized the child to be his child; or

        (4) Has subsequently married the mother[8]
and has acknowledged himself, orally or
in writing, to be the father.

Md. Code Ann. Estates & Trusts § 1-208 (1996).  The burden is on a claimant to establish paternity by a preponderance of the evidence.[9]  Md. Code Ann. Family Law § 5-1027(a)(2001).

---

    [7]Claimant does not allege that Jirau acknowledged that he was her father in writing.

    [8]Claimant does not allege that her mother and Jirau were ever married.

    [9]Maryland's Family Law Code § 5-1029(f)(4) provides that paternity may also be established through genetic testing.  In relevant part, the statute provides that "[a] laboratory report received into evidence establishing a statistical probability of the alleged father's paternity of at least 99.0% constitutes a rebuttable presumption of his paternity."  Md. Family Law Code Ann. § 5-1029(f)(4)(2001).
    The ALJ found that the results of the DNA test administered to Manuel Jirau did not conclusively establish that Jirau was Claimant's father.  The test determined that there was a 97.62% probability that Jirau was Claimant's father, as opposed to an untested, unrelated man.  The ALJ erroneously stated that a probability level of less than 99% amounted to "conclusive evidence of non-paternity."  (R. 21.)
    The Maryland statute explains "the laboratory report of the blood or genetic test shall be received as evidence if . . . the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%."  Md. Code Ann. Family Law § 5-1029(f)(1)(ii).  Although a 97.62% probability does not create a rebuttable presumption of

13

The New Jersey order declared that "Jimmy Jirau, now deceased, was the natural father of the minor child, Antonia Teschner." *Teschner v. Jirau*, No. FD-01-976-99B (N.J. Super. Ch. Div. Feb. 16, 1999). The Commissioner concluded that the New Jersey court was without jurisdiction or authority to issue the order determining paternity. (R. 11.) The Commissioner also noted that the New Jersey order did not provide any information regarding the evidence or rationale for the determination, and that it was issued ten years after Jirau's death. (*Id.*) The Commissioner's determination that the New Jersey order was insufficient to satisfy the Maryland intestacy statute is incorrect as a matter of law. (*Id.*)

Although the Maryland statute's reference to "the statutes relating to paternity proceedings" might suggest that only determinations of paternity made under Maryland law would suffice, the Family Law article contains a provision indicating that a paternity judgment made pursuant to another state's statute would be acceptable. Md. Code Ann., Fam. Law § 5-1048 (2001).

Section 5-1048 explains that "[a] finding of paternity established in any other state shall have the same force and

---

paternity, the test results are admissible as evidence that Jirau was Claimant's father. Md. Code Ann. Family Law § 5-1029(f)(4).

14

effect in a proceeding under this subtitle as in any other civil proceeding in this state if. . . (1) with respect to an adjudication of paternity, the finding was established by a court or by an administrative process that includes a right to appeal to a court. . . ." *Id.* As the judgment here was rendered by the Superior Court, it clearly satisfies the requirement of Section 5-1048.

Contrary to the Commissioner's erroneous conclusion, the Superior Court had jurisdiction over the paternity action. New Jersey Parentage Act provides that the Superior Court has jurisdiction over paternity actions brought under the Act. N.J.S.A. § 9:17-46(a)(1991). A person who has sexual intercourse in the state submits to the jurisdiction of the Superior Court as to an action with respect to a child who may have been conceived as a result of the sexual acts. N.J.S.A. § 9:17-46(b). Venue is proper in any county in which the child resides. N.J.S.A. § 9:17-46(c).

Based upon this statute, the New Jersey court had jurisdiction to issue the order in the paternity action brought by Teschner. Teschner and Jirau were living together as a couple in Atlantic City, New Jersey, when Claimant was conceived. Claimant resided in Northfield, Atlantic County, New Jersey, at the time the Complaint was filed. (R. 154.) Jirau's representative took part in the proceeding. As a result, the

Superior Court of New Jersey, Atlantic County, had both subject matter and personal jurisdiction over the matter. Venue was properly laid in Atlantic County.

Additionally, as a matter of full faith and credit, a Maryland court may be required to acknowledge an out-of-state order determining paternity for the purposes of determining inheritance rights. U.S. Const. Art. IV, § 1; 28 U.S.C. § 1738 (2003). The Full Faith and Credit Clause of Article IV requires that "the judgment of a state court should have the same credit, validity, and effect, in every other court of the United States, which it had in the state where it was pronounced." *Underwriter's Nat'l Assurance Co. v. North Carolina Life and Accident and Health Ins. Guaranty Assoc.,* 455 U.S. 691, 704 (1982). "Maryland has long recognized that valid judgments of another state concerning domestic matters are generally entitled to full faith and credit in this State." *Superior Court of California v. Ricketts*, 836 A.2d 707, 734 (Md. App. 2003).

There is nothing to suggest that a New Jersey court would not honor the paternity judgment here. The Superior Court had jurisdiction over the matter. Claimant's mother and Manual Jirau, as the personal representative of Jirau's estate, were identified in the action.[10] Affidavits were submitted in

---

[10] The other defendants were Jirau and John Eugene Teschner. John Eugene Teschner was Marion Teschner's husband. (RR. 102-3.) Although the two were still legally married when Claimant was

16

support of the complaint.  Moreover, the New Jersey Parentage Act provides that an adjudication of paternity "shall only be voided upon a finding that there exists clear and convincing evidence of: fraud, duress or a material mistake of fact. . . ."  N.J.S.A. § 9:17-41(b)(1998).  There is no indication that any of these conditions were present in the New Jersey proceeding.[11]

Furthermore, neither New Jersey nor Maryland law appears to preclude adjudications of paternity after the death of the putative father.  The New Jersey Parentage Act expressly provides that paternity actions may be instituted against the estate or legal representative of the putative father, as occurred here.[12]  N.J.S.A. § 9:17-45(c).  Although the Maryland statute does not

---

born, the couple separated in 1974.  (*Id*.)  At the time Claimant was conceived, John Eugene Teschner was incarcerated in Florida.  (*Id*.)  The last time Teschner spoke with her husband was in 1982, and subsequent efforts to contact him were unsuccessful.  (*Id*.)

[11] The subsequent DNA testing does not suggest that the New Jersey order was based upon a material mistake of fact.  To the contrary, the results establish the validity of the order. N.J.S.A. 9:17-48(i) provides that "genetic test results indicating a 95% or greater probability that the alleged father is the father of the child shall create a presumption of paternity which may be rebutted only by clear and convincing evidence that the results of the test are not reliable in that particular case."  Additionally, Maryland law recognizes that a 97.6% probability, as here, is evidence of paternity, although such a result would not conclusive of the issue.

[12] This provision does not alter the statute of limitations for paternity actions. As long as the action was brought within five years after the child attains the age of majority, even a ten-year gap between the death of the putative father and the institution of the action would not bar the action under the statute.  *See* N.J.S.A. § 9:17-45(b).

17

expressly address the issue, the Court of Appeals of Maryland has held that at least in some instances posthumous determinations of paternity are permissible. *Taxiera v. Malkmus*, 578 A.2d 761 (Md. 1990)(holding that circuit court had authority to declare paternity under paternity statute where putative father died after conception of but before birth of child).[13]

## V.

For the aforementioned reasons, this Court will reverse the decision of the Commissioner and remand the action to the Commissioner for payment of benefits.  The Court will issue an appropriate order.

Dated: August 17th, 2005.

                                          s/*Joseph E. Irenas*
                                          JOSEPH E. IRENAS, S.U.S.D.J.

---

[13]As a result of this holding, the Court does not address the validity of the Commissioner's determinations that Claimant had not established entitlement to surviving child's benefits either under the "open and notorious" provision of Maryland's intestacy law or by demonstrating that Jirau was her natural father and had supported her while he was alive in satisfaction of Section 416(h)(3)(C)(ii).